**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTAROME FRAGRANCE & FLAVOR CORP. | |
|           Plaintiff and Counterclaim Defendant, | |
|    v. | |
| MICHAEL G. ZARKADES, | Civ. No. 07-873 (DRD) |
|          Defendant and Counter-Claimant, | **O P I N I O N** |
|    and | |
| MICHAEL G. ZARKADES, | |
|          Third-Party Plaintiff, | |
|    v. | |
| DANIEL G. FUNSCH, | |
|          Third-Party Defendant. | |

*Appearances by:*

James H. Forte, Esq.
SAIBER LLC
One Gateway Center, 13th Floor
Newark, New Jersey  07102-5311

   *Attorneys for Plaintiff and Counterclaim Defendant Intarome Fragrance & Flavor Corp.*
   *and Third-Party Defendant Daniel G. Funsch*


Robert M. Rich
LAW OFFICES OF ROBERT M. RICH

25 Pompton Avenue
Verona, New Jersey  07044

Charles H. Goldstein, Esq.
THE GOLDSTEIN LAW FIRM
8912 Burton Way
Beverly Hills, California  90211

Joseph A. Goldstein, Esq.
THE GOLDSTEIN LAW FIRM
1739 K. Street, Suite 600
Washington, D.C.  20036

> *Attorneys for Defendant, Counter-Claimant, and Third-Party Plaintiff Michael G.*
> *Zarkades*

**<u>DEBEVOISE, Senior District Judge</u>**

On February 6, 2007, Plaintiff and Counterclaim Defendant Intarome Fragrance and

Flavor Corp. ("Intarome") filed a verified complaint against Michael G. Zarkades in the Superior

Court of New Jersey, Law Division, alleging breach of covenants of confidentiality and non-

competition, unfair competition and unjust enrichment.  Mr. Zarkades removed the action to this

court, where he filed a "First Amended Cross-Complaint" on May 1, 2007 (Docket Entry No.

21) against Intarome and Third-Party Defendant Daniel G. Funsch and a "Second Amended

Answer, Counterclaim and Third Party Complaint" (hereafter, "Second Am. Answer") on

February 26, 2008 (Docket Entry No. 40) against Intarome and Mr. Funsch.  Intarome and Mr.

Funsch now move for partial summary judgment dismissing Counts One, Two, and Nine of the

Second Amended Counterclaim, and limiting the compensatory damages that Zarkades may

recover on (1) Counts Three, Four, and Five of the Second Amended Counterclaim, and (2) on

all Counts of the Third-Party Complaint.  Mr. Zarkades cross-moves for summary judgment on

Counts One, Two, and Nine of the Second Amended Counterclaim.  For the reasons set forth

below, Intarome's and Mr. Funsch's motion will be granted and Mr. Zarkades's motion will be

denied.

## I.  BACKGROUND

Intarome is a New Jersey manufacturer of fragrances and flavors for use in the

production of consumer and non-consumer products.  Mr. Funsch is the President and Chief

Executive Officer of Intarome.  On or about July 1, 1997, Intarome hired Mr. Zarkades as an

Executive Vice President.  Mr. Zarkades remained employed with Intarome until May 22, 2006.

### A.    The Subscription Agreement

Two years after Intarome hired Mr. Zarkades, on or about July 1, 1999, Intarome and Mr.

Zarkades entered into an agreement entitled "Michael G. Zarkades Subscription Agreement for

Shares of Intarome Fragrance Corporation Dated July 1, 1999" (the "Subscription Agreement").

Intarome and Mr. Zarkades were the only parties to the Subscription Agreement.  In accordance

with the Subscription Agreement, Mr. Zarkades paid a total of $50,000 for 12,500 shares of

Intarome Class A stock.  He paid $10,000 on June 30, 2000, and $40,000 on December 13, 2000.

Paragraph 2 of the Subscription Agreement is central to these motions.  The "Subscriber"

in Paragraph 2 is Mr. Zarkades.

> 2. If the holders of a majority of the issued and outstanding shares of
> Intarome (the "Majority Shareholders") enter into an agreement to
> sell all of the shares owned by them to a third party, the Subscriber
> shall be required to execute such agreement and to sell all of the
> shares of Intarome owned by him to such third party on the same
> terms and conditions as the Majority Shareholders have agreed to sell
> their shares.  If the Subscriber fails to execute such agreement within
> five (5) days after having been requested to do so by any shareholder
> owning twenty-five per cent (25%) or more of the issued and
> outstanding shares of Intarome, Intarome shall have the absolute
> right, upon five (5) days' written notice to the Subscriber, to
> repurchase the shares of Intarome owned by the Subscriber for the

> purchase price set forth in paragraph 1 above, irrespective of the price at which the majority of the shareholders had agreed to sell their shares to the third party, and all subscription rights the Subscriber may have had under this Agreement to purchase any further shares of Intarome shall terminate and be of no further force and effect.

The Subscription Agreement also provides that it "shall be governed by and interpreted under the laws of the State of New Jersey" and that the "agreement contains the entire understanding and agreement of the parties with respect to the subject matter hereof." (Subscription Agreement ¶ 10.)

**B.    The ESOP**

In 2001, Intarome established the Intarome Fragrance Corporation Employee Stock Ownership Plan and related Intarome Fragrance Corporation Employee Stock Ownership Trust (collectively, "ESOP"). Under the ESOP, certain Intarome shareholders exchanged their Class A Stock and Class B Stock of Intarome stock for shares of a new class of stock known as Class B ESOP Convertible Preferred Stock, and then sold their Class B ESOP Convertible Preferred Stock to the ESOP. The parties dispute the exact date of the "creation" of the ESOP, but it is undisputed that the Stock Purchase Agreement, pursuant to which some shareholders sold their Class B ESOP Convertible Preferred Stock to the ESOP, was made on September 18, 2001.

It is also undisputed that the 12,500 shares of Class A Stock that Mr. Zarkades owned were not sold to the ESOP and that, thereafter, Intarome paid dividends to Mr. Zarkades with respect to his 12,500 shares. The parties contest whether Mr. Zarkades wanted to sell his shares to the ESOP and whether he expressed to Mr. Funsch, or to someone else at Intarome, an interest in selling or in retaining his shares. This issue of fact is not relevant to the resolution of these motions, however, because, as explained below, under the plain meaning of the terms of the

4

Subscription Agreement, Intarome was not required to give Mr. Zarkades the opportunity to sell his shares to the ESOP.

## II.  DISCUSSION

**A.     Standard of Review for Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.     Contract Interpretation**

Contracts should be construed according to the plain and ordinary meaning of their terms. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted). Thus, the court must give force to the intent of the parties by interpreting the Supscription Agreement between Intarome and Mr. Zarkades according to the plain meaning of its terms. Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate. Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999). To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning." Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted). If the meaning of a contract is ambiguous, it is not subject to summary judgment. As discussed below, all of the terms of the relevant provisions of the Subscription Agreement are subject to one reasonable interpretation.

**C.      Motions Regarding Counts One, Two and Nine of the Counterclaim**

Intarome and Mr. Funsch move for summary judgment dismissing Counts One, Two, and Nine of the Second Amended Counterclaim.  Mr. Zarkedes moves for summary judgment granting these claims.  Count One is for "Breach of Written Contract – Subscription Agreement."  Count Two is for "Breach of Covenant of Good Faith and Fair Dealing – Subscription Agreement."  Count Nine is for "Declaratory Relief as to Subscription Agreement."

The essential allegation underlying these three counts is Mr. Zarkades's claim that "Intarome breached the material terms of Provision 2 contained in the subscription agreement by denying Zarkades the opportunity to sell his 12,500 shares to the ESOP on the same basis as the majority selling shareholders."  (Second Am. Answer ¶¶ 42 and 101.)  Intarome and Mr. Funsch maintain that the Subscription Agreement does not require Intarome to provide Mr. Zarkades with such opportunity.

The first sentence of Paragraph 2 of the Subscription Agreement states:

> 2.  If the holders of a majority of the issued and outstanding shares of Intarome (the "Majority Shareholders") enter into an agreement to sell all of the shares owned by them to a third party, the Subscriber shall be required to execute such agreement and to sell all of the shares of Intarome owned by him to such third party on the same terms and conditions as the Majority Shareholders have agreed to sell their shares.

This sentence requires Mr. Zarkades to execute an agreement to sell his shares of Intarome to a third party if a majority of the shareholders of Intarome enter into an agreement to sell their shares to that third party.  The second sentence of Paragraph 2 reads:

> If the Subscriber fails to execute such agreement within five (5) days after having been requested to do so by any shareholder owning twenty-five per cent (25%) or more of the issued and outstanding shares of Intarome, Intarome shall have the absolute right, upon five

(5) days' written notice to the Subscriber, to repurchase the shares of Intarome owned by the Subscriber for the purchase price set forth in paragraph 1 above, irrespective of the price at which the majority of the shareholders had agreed to sell their shares to the third party, and all subscription rights the Subscriber may have had under this Agreement to purchase any further shares of Intarome shall terminate and be of no further force and effect.

This sentence sets forth the consequences of Mr. Zarkades's failure to execute that agreement if he is requested to do so "by any shareholder owning twenty-five per cent (25%) or more of the issued and outstanding shares of Intarome." If Mr. Zarkades is not requested by such a shareholder to execute an agreement, neither this paragraph nor any other in the Subscription Agreement provides for any consequences for Mr. Zarkades.

By the plain meaning of its terms, Paragraph 2 places obligations on Mr. Zarkades and provides rights to Intarome. Mr. Zarkades is "<u>required</u> to execute" an agreement to sell his shares to a third party and, if he is requested to execute such an agreement and does not, Intarome has "the absolute <u>right</u>" to repurchase Mr. Zarkades's shares at a price specified in the Subscription Agreement. Paragraph 2 does not impose any obligations on Intarome.

Mr. Zarkades argues that "Paragraph 2 of the Subscription Agreement requires Intarome to accept an offer by Zarkades to sell his shares to a third party, in this case to Intarome's ESOP, on the same terms and conditions as the other selling shareholders." (Def.'s Opp'n Br. 11.) Mr. Zarkades concedes that the explicit terms of the Subscription Agreement do not include such a requirement but, rather, contends that "it is an implied term of Paragraph 2 that Intarome would accept an offer by Zarkades to sell his shares since this term would be necessary to give business efficacy to the contract as written." (<u>Id.</u> at 12 (internal quotations omitted); citing <u>Glenside W. Corp. v. Exxon Co., U.S.A.</u>, 761 F. Supp. 1100, 1112 (D.N.J. 1991).) Mr. Zarkades also argues

that Paragraph 2 "could only be interpreted to mean that Intarome was required to provide Zarkades with an opportunity to sell his shares to a third party on the same terms and conditions as other selling shareholders."  (Id.)

Mr. Zarkades's arguments that Intarome was (1) required to accept an offer by Zarkades to sell his shares to a third party; and (2) required to provide Zarkades with an opportunity to sell his shares to a third party are not supported by the plain meaning of the contract.[1]  First, as discussed above, Paragraph 2 of the Subscription agreement does not require Intarome to do anything.  Paragraph 2 places requirements on Mr. Zarkades and provides rights to Intarome: Mr. Zarkades is "required to execute" an agreement to sell his shares to a third party and, if he is requested to execute such an agreement and does not, Intarome has "the absolute right" to repurchase Mr. Zarkades's shares at a specified price.

Second, Mr. Zarkades's proposed reading of Paragraph 2 would require that Intarome somehow have control over any "third party" with whom the Majority Shareholders enter into an agreement to sell their stock.  Although, in the situation at issue here, Intarome may have actually had some control over the third party (though the level of such control, if any, is unclear

---

[1]     Mr. Zarkades argues that Paragraph 2 is unambiguous, i.e., that "a rational fact finder could only arrive at one conclusion as to the plain and implied meaning of Paragraph 2."  (Def.'s Opp'n Br. 14.)  Yet he also invites the court to consider the post-execution conduct of the parties, arguing that when contractual language is ambiguous, a court may consider the post-execution conduct of the parties to aid interpretation.  (Id. at 15.)  Because the court finds that Paragraph 2 of the Subscription Agreement is unambiguous, it will not look at the post-execution conduct of the parties.

from the submissions of the parties), the plain language of the contract does not indicate that Intarome would necessarily have control over a third party to whom the Majority Shareholders decide to sell their stock.  Intarome and Mr. Zarkades are the only parties to the Subscription Agreement; the "third party" in Paragraph 2 is not only unnamed and unknown, but, by definition, is not a party to the contract.  Thus, Mr. Zarkades's suggestion that Intarome was "required to accept an offer by Zarkades to sell his shares to a third party" is both illogical and impracticable.  Intarome could not accept an offer by Zarkades to sell his shares to a third party unless Intarome had control over that third party.  Otherwise, Intarome's "acceptance" of the offer would be meaningless.  Similarly, Intarome could not actually "provide Zarkades with an opportunity to sell his shares to a third party" because only the third party could provide Mr. Zarkades with such an opportunity.

Third, Mr. Zarkades's argument that his proposed implied term is necessary to give the agreement "business efficacy" is based on the assumptions that, in order to give the agreement business efficacy, Mr. Zarkades must actually sell his shares of Intarome whenever the Majority Shareholders enter into an agreement to sell their shares, and there is no trigger for that obligation.  These assumptions are incorrect.  Rather, when the first and second sentences of Paragraph 2 are read together, it is clear that, in order to give the agreement business efficacy, Mr. Zarkades must sell his shares of Intarome only if requested to do so by a shareholder owning twenty-five per cent or more of the issued or outstanding shares of Intarome.  The first sentence explains the obligation of Mr. Zarkades to enter into an agreement to sell his shares if the Majority Shareholders enter into such an agreement with a third party, and the second sentence explains the trigger for that requirement.  The requirement for Mr. Zarkades to sell his shares is

10

triggered only by the request to do so by a shareholder owning twenty-five per cent or more of the issued or outstanding shares of Intarome.  If no such request is made, there is no consequence for Mr. Zarkades and, thus, the "requirement" of the first sentence has no effect.

### i.       Counts One and Nine

Counts One and Nine of Mr. Zarkades's Counterclaims (breach of written contract and declaratory relief) allege that "Intarome breached the material terms of Provision 2 contained in the Subscription Agreement by denying Zarkades the opportunity to sell his 12,500 shares to the ESOP on the same basis as the majority selling shareholders."  (Second Am. Answer ¶¶ 42 and 101.)  Because, as explained above, Intarome does not have an obligation under the Subscription Agreement to provide Mr. Zarkades with such an opportunity to sell his shares, it would not be a breach of the Subscription Agreement for Intarome to deny Mr. Zarkades this opportunity to sell his shares, if Intarome even had the power to so deny him.  Thus, summary judgment dismissing Counts One and Nine of the Second Amended Counterclaim is appropriate.

### ii.      Count Two

Count Two of Mr. Zarkades's Counterclaims is for breach of the covenant of good faith and fair dealing.  As Mr. Zarkades noted, "[E]very contract imposes on each party the duty of good faith and fair dealing in its performance and its enforcement."  Pickett v. Lloyd's & Peerless Ins. Agency, Inc., 131 N.J. 457, 467 (1993).  The implied covenant therefore ensures that "neither party to a contract shall injure the right of the other to receive the fruits of the agreement."  Onderdonk v. Presbyterian Homes of New Jersey, 85 N.J. 171, 182 (1981).  "A plaintiff may be entitled to relief under the covenant [of good faith and fair dealing] if its reasonable expectations are destroyed when a defendant acts with ill motives and without any

legitimate purpose." <u>DiCarlo v. St. Mary Hosp.</u>, 530 F.3d 255, 267 (3d Cir. 2008) (quoting

<u>Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.</u>, 182 N.J. 210, 226 (2005)

(internal quotations omitted)).  Because Mr. Zarkades did not have the right to receive the "fruits

of the agreement" that he claims in this count, i.e., the opportunity to sell his shares of Intarome

stock to the ESOP, that "right" could not possibly be injured by Intarome.  Similarly, Mr.

Zarkades could not have had a "reasonable expectation" to have this opportunity because the

terms of the Subscription Agreement did not provide for such; thus, Intarome could not have

destroyed a reasonable expectation that did not exist or was not reasonable.  Thus, summary

judgment dismissing Count Two of the Second Amended Counterclaim is appropriate.

**D.     Intarome's & Mr. Funsch's Motion Regarding Compensatory Damages**

Intarome and Mr. Funsch move for partial summary judgment limiting compensatory

damages on Counts Three, Four, and Five of the Second Amended Counterclaim, all of which

are against Intarome, and on all counts of the Third-Party Complaint, all of which are against

Mr. Funsch.  Counts Three, Four, and Five of the Second Amended Counterclaim are for breach

of fiduciary duty, fraud, and negligent misrepresentation, respectively.  The Counts of the Third-

Party complaint are also for breach of fiduciary duty, fraud, and negligent misrepresentation.

Intarome and Mr. Funsch argue that if Mr. Zarkades is successful on these claims, he

"would be entitled to compensatory damages in the amount that he would have received from the

ESOP for the sale of his shares, minus any dividends that he later received from his shares."

(Pl.'s Mot. Summ. J. 22.)  Mr. Zarkades agrees with at least the first part of this statement.[2]  He

---

[2]     In their opening brief, Intarome and Mr. Funsch described a different "potential measure" of damages which it believed Mr. Zarkades would pursue.  That other measure, as described by Intarome and Mr. Funsch, was "to determine what the current value of Zarkades'[s] 12,500 Class

states in his opposition brief that the compensatory damage calculation for his claims "should be the amount that Zarkades would have received if Intarome had not violated Paragraph 2 of the Subscription agreement and had given him the opportunity to sell his shares to the ESOP and accepted his offer to add his name to the list of selling shareholders."  (Def.'s Opp'n Br. 28.)  Thus, the parties are in general agreement on the appropriate calculation for the compensatory damages for these claims.

The only other aspect of this issue addressed by either party is the contention of Intarome and Mr. Funsch that any compensatory damages awarded to Mr. Zarkades under these claims should be reduced by the amount of dividends he received from his shares after the creation of the ESOP.[3]  Under New Jersey law, "an injured party with the legal right to be compensated for the breach of a contract is entitled to the amount of damages . . . which . . . will put that party in the same position it would have been in if the breaching party had performed the contract in accordance with its terms, no better position and no worse."  Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 292-93 (App. Div. 1998); Agathos v. Starlite Motel, 977 F.2d 1500, 1510 (3d Cir. 1992) ("In a suit for breach of contract, the general purpose of the law is to place the injured party in the position it would have attained had the contract been performed."); Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 12-13 (2007) ("Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed.").  Thus, Intarome and Mr. Funsch are correct in their

A share[s] is, and subtract the current value from the value of Zarkades'[s] shares on September 18, 2001, the date of the contract breach."  (Pl.'s Mot. Summ. J. 22, quoting Zarkades's September 17, 2007 letter application to compel discovery.)  Mr. Zarkades did not address this "potential measure" of damages in his opposition brief.

allegation that if Mr. Zarkades prevails on any of his claims for which he seeks compensatory damages (which will be calculated as described above) those damages shall be reduced by the amount of dividends Mr. Zarkades received on his Intarome stock after the breach occurred.  If Mr. Zarkades were to keep both the dividends paid on his stock after September 18, 2001 and the compensatory damages as described above, he would be in a better position than if the contract had not been breached.

Because there are no issues of material fact with regard to how potential compensatory damages should be calculated, Intarome's and Mr. Funsch's motion for summary judgment will be granted.  Any compensatory damages awarded to Mr. Zarkades under Counts Three, Four, or Five of the Second Amended Counterclaim or under any count of the Third-Party Complaint shall be equal to the amount that Mr. Zarkades would have received from the ESOP for the sale of his shares on September 18, 2001, minus any dividends he actually received on those shares after September 18, 2001.  The parties do not address, and the court makes no finding on, any other possible increase (such as pre-judgment interest) or decrease to an award of compensatory damages on these claims or on any other claims in this case.

---

[3]      Neither party put forth evidence regarding the amount of dividends Mr. Zarkades received during this period of time.

**IV.  CONCLUSION**

For the reasons set forth above, Intarome's motion for summary judgment will be granted and Mr. Zarkedes's motion for summary judgment will be denied.  The Court will enter an order implementing this opinion.


                                                 s/ Dickinson R. Debevoise

                                         DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: December 1, 2008