**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INTAROME FRAGRANCE & FLAVOR CORP. | |
|         Plaintiff and Counterclaim Defendant, | |
|    v. | |
| MICHAEL G. ZARKADES, | Civ. No. 07-873 (DRD) |
|         Defendant and Counter-Claimant, | **O P I N I O N** |
|   and | |
| MICHAEL G. ZARKADES, | |
|         Third-Party Plaintiff, | |
|    v. | |
| DANIEL G. FUNSCH, | |
|         Third-Party Defendant. | |

*Appearances by:*

James H. Forte, Esq.
SAIBER LLC
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311

    *Attorneys for Plaintiff and Counterclaim Defendant Intarome Fragrance & Flavor Corp.*
    *and Third-Party Defendant Daniel G. Funsch*

Robert M. Rich, Esq.
LAW OFFICES OF ROBERT M. RICH

25 Pompton Avenue
Verona, New Jersey  07044

Charles H. Goldstein, Esq.
THE GOLDSTEIN LAW FIRM
8912 Burton Way
Beverly Hills, California  90211

Joseph A. Goldstein, Esq.
THE GOLDSTEIN LAW FIRM
1739 K Street, Suite 600
Washington, D.C.  20036

*Attorneys for Defendant, Counter-Claimant, and Third-Party Plaintiff Michael G. Zarkades*

**DEBEVOISE, Senior District Judge**

On February 6, 2007, Plaintiff and Counterclaim Defendant Intarome Fragrance and Flavor Corp. ("Intarome") filed a verified complaint against Michael G. Zarkades in the Superior Court of New Jersey, Law Division, alleging breach of covenants of confidentiality and non-competition, unfair competition and unjust enrichment.  Mr. Zarkades removed the action to this court, where he filed a "First Amended Cross-Complaint" on May 1, 2007 (Docket Entry No. 21) against Intarome and Third-Party Defendant Daniel G. Funsch and a "Second Amended Answer, Counterclaim and Third Party Complaint" on February 26, 2008 (Docket Entry No. 40) against Intarome and Mr. Funsch.  On September 22, 2008, Intarome and Mr. Funsch moved for partial summary judgment dismissing Counts One, Two, and Nine of the Second Amended Counterclaim ("SAC"), and limiting the compensatory damages that Zarkades may recover on (1) Counts Three, Four, and Five of the Second Amended Counterclaim, and (2) on all Counts of the Third-Party Complaint ("TPC").  On October 20, 2008, Mr. Zarkades cross-moved for partial summary judgment on Counts One, Two, and Nine of the SAC.  In an opinion and order dated

2

December 1, 2008, the court granted the motions of Intarome and Mr. Funsch and denied the motion of Mr. Zarkades.

Intarome and Mr. Funsch now move for partial summary judgment dismissing Counts Three, Four, and Five of the SAC and all counts of the TPC.  For the reasons set forth below, Intarome and Mr. Funsch's motion will be granted in part and denied in part.

## I.  BACKGROUND

Intarome is a corporation organized and existing under the laws of the State of Delaware and engaged in the manufacture of fragrances and flavors for use in the production of consumer and non-consumer products.  Intarome's principal place of business is in Norwood, New Jersey. Mr. Funsch is the President and Chief Executive Officer of Intarome.  At all relevant times, Intarome also maintained a place of business in California.  On or about July 1, 1997, Intarome hired Mr. Zarkades as an Executive Vice President.  Mr. Zarkades is, and at all relevant times was, a citizen of the State of California, residing in Orange County.  Mr. Zarkades remained employed with Intarome until May 22, 2006.

**A.      The Subscription Agreement**

Two years after Intarome hired Mr. Zarkades, on or about July 1, 1999, Intarome and Mr. Zarkades entered into an agreement entitled "Michael G. Zarkades Subscription Agreement for Shares of Intarome Fragrance Corporation Dated July 1, 1999" (the "Subscription Agreement"). Intarome and Mr. Zarkades were the only parties to the Subscription Agreement.  In accordance with the Subscription Agreement, Mr. Zarkades paid a total of $50,000 for 12,500 shares of Intarome Class A stock.  He paid $10,000 on June 30, 2000, and $40,000 on December 13, 2000. Intarome delivered the shares to Mr. Zarkades in California.  The Subscription Agreement also

3

provides that it "shall be governed by and interpreted under the laws of the State of New Jersey" and that the "agreement contains the entire understanding and agreement of the parties with respect to the subject matter hereof." (Subscription Agreement ¶ 10.)

**B.    The ESOP**

In 2001, Intarome established the Intarome Fragrance Corporation Employee Stock Ownership Plan and related Intarome Fragrance Corporation Employee Stock Ownership Trust (collectively, "ESOP"). Under the ESOP, certain Intarome shareholders exchanged their Class A Stock and Class B Stock of Intarome stock for shares of a new class of stock known as Class B ESOP Convertible Preferred Stock, and then sold their Class B ESOP Convertible Preferred Stock to the ESOP. The parties dispute the exact date of the "creation" of the ESOP, but it is undisputed that the Stock Purchase Agreement, pursuant to which some shareholders sold their Class B ESOP Convertible Preferred Stock to the ESOP, was made on September 18, 2001.

Mr. Zarkades alleged that Intarome breached the material terms of paragraph 2 of the Subscription Agreement[1] by denying him the opportunity to sell his 12,500 shares to the ESOP

---

[1] Paragraph 2 of the Subscription Agreement states:

> 2. If the holders of a majority of the issued and outstanding shares of Intarome (the "Majority Shareholders") enter into an agreement to sell all of the shares owned by them to a third party, the Subscriber shall be required to execute such agreement and to sell all of the shares of Intarome owned by him to such third party on the same terms and conditions as the Majority Shareholders have agreed to sell their shares. If the Subscriber fails to execute such agreement within five (5) days after having been requested to do so by any shareholder owning twenty-five per cent (25%) or more of the issued and outstanding shares of Intarome, Intarome shall have the absolute right, upon five (5) days' written notice to the Subscriber, to repurchase the shares of Intarome owned by the Subscriber for the purchase price set forth in paragraph 1 above, irrespective of the price at which the majority of the shareholders had agreed to sell their

4

on the same basis as the majority selling shareholders.  In an opinion dated December 1, 2008, this court held that under the plain meaning of the Subscription Agreement, Intarome was not required to give Mr. Zarkades the opportunity to sell his shares to the ESOP.  (Dec. 1, 2008 Slip Op. at 7 – 11.)  Based on the plain meaning of the Subscription Agreement, this court dismissed Counts One, Two and Nine of the SAC.  (Id. at 11 - 12.)

It is undisputed that the 12,500 shares of Class A Stock that Mr. Zarkades owned were not sold to the ESOP and that, thereafter, Intarome paid dividends to Mr. Zarkades with respect to his 12,500 shares.  The parties contest whether Mr. Zarkades wanted to sell his shares to the ESOP and whether he expressed to Mr. Funsch, or to someone else at Intarome, an interest in selling or in retaining his shares.

**C.     Claims of Breach of Fiduciary Duty, Fraud & Negligent Misrepresentation**

At issue in this motion are Mr. Zarkades's claims against Intarome and Mr. Funsch for breach of fiduciary duty, fraud and negligent misrepresentation.  Intarome and Mr. Funsch move for summary judgment dismissing Counts Three, Four, and Five of the SAC and all Counts of the TPC.  Counts Three, Four, and Five of the SAC are for breach of fiduciary duty, fraud, and negligent misrepresentation, respectively.  The Counts of the TPC are also for breach of fiduciary duty, fraud, and negligent misrepresentation.  These counts are based on the same allegations as Counts Three, Four, and Five of the SAC, but are made against Mr. Funsch instead of Intarome.

---

shares to the third party, and all subscription rights the Subscriber may have had under this Agreement to purchase any further shares of Intarome shall terminate and be of no further force and effect.

Mr. Zarkades alleges that on two occasions between July 1 and August 20, 2001, in his capacity as Executive Vice President of Intarome, he attended, in person, meetings with Mr. Funsch at Intarome's Norwood, New Jersey corporate headquarters to discuss Intarome's current sales figures and to develop future sales strategy for the company.  For the purpose of this motion, Intarome and Mr. Funsch admit this allegation.  There is no dispute that Mr. Funsch asked Mr. Zarkades at least twice before August 20, 2001 whether Mr. Zarkades wished to sell his shares of Intarome common stock to the ESOP trust.  For the purpose of this motion, Intarome and Mr. Funsch also admit that Mr. Funsch made these inquiries of Mr. Zarkades after the two in-person meetings in New Jersey between July 1 and August 20, 2001.  For the purpose of this motion, Intarome and Mr. Funsch also admit that Mr. Funsch did not provide Mr. Zarkades with purchase price information related to the ESOP and other details of the sale.

Mr. Zarkades claims that he asked Mr. Funsch to see financial information, but Mr. Funsch refused to provide such information, which would have included the Stock Purchase Agreement, containing the material details of the sale, including the price to be paid to each of the selling shareholders and other terms and conditions of the sale.  Intarome and Mr. Funsch deny this allegation because they contend that the Stock Purchase Agreement, which contains a common stock analysis of Intarome as of August 31, 2001, did not exist as of August 20, 2001, so Mr. Funsch could not have refused to provide a document to Mr. Zarkades that did not exist.

Mr. Zarkades also alleges that Mr. Funsch told him, on each of the two occasions between July 1 and August 20, 2001 mentioned above, that if he sold his Intarome shares to the ESOP, Mr. Zarkades could no longer be an employee of Intarome.  For the purpose of this motion, Intarome and Mr. Funsch admit this allegation and admit that Mr. Zarkades responded to

Mr. Funsch that he had an employment agreement with Intarome and could not be fired for

deciding to sell his shares of Intarome.  Intarome and Mr. Funsch also admit, for the purpose of

this motion, that Mr. Funsch responded that it was still his belief, as President of Intarome, that

Mr. Zarkades could be fired if he decided to sell his Intarome shares.

      Mr. Zarkades alleges in the SAC/TPC that, on September 14, 2001, Mr. Funsch "falsely

represented" to him that the ESOP transaction had closed on September 13, 2001 when,

according to Mr. Zarkades, Mr. Funsch knew that the ESOP transaction would not close until

September 18, 2001.  (SAC ¶ 33.)  The parties did not argue where these alleged statements were

made by Mr. Funsch or received by Mr. Zarkades, but it appears from the evidence submitted in

support of this motion and the parties' previous motions for summary judgment that Mr. Funsch

was in New Jersey and Mr. Zarkades was in California on September 14, 2001.

      Mr. Zarkades claims that his "primary and most significant reason" for not accepting the

offers, made by Mr. Funsch between July 1 and August 20, 2001, to sell his Intarome shares was

that Mr. Funsch did not fully and fairly disclose all information that was material to the purchase

of the shares and did not provide the Stock Purchase Agreement, which contained the material

details of the stock purchase, including the price to be paid.  Intarome and Mr. Funsch deny this

allegation based on the following statement from Mr. Zarkades's October 17, 2008 Certification:

"Had I been offered the opportunity by Intarome to sell my 12,200 Class A shares of stock

without having to leave Intarome, I would have sold all of my stock in Intarome and received the

same amount of money that Walter Zachritz received, which was $624,974." (Certification of

Michael G. Zarkades in Support of Zarkades's Motion for Partial Summary Judgment ¶ 23,

October 17, 2008.)

## II.  DISCUSSION

**A.      Standard of Review for Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there

8

is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If there

are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.**      **Choice of Law**

        When, as here, a federal court hears a case pursuant to its diversity jurisdiction, it must

apply the conflict of laws rules of the state in which it sits.  <u>Klaxon Co. v. Stentor Elec. Mfg.</u>

<u>Co.</u>, 313 U.S. 487, 496 (1941); <u>Day & Zimmerman, Inc. v. Challoner</u>, 423 U.S. 3, 4 (1975)

(citing <u>Klaxon</u>).  "The New Jersey Supreme Court has held that choice-of-law determinations are

made on an issue-by-issue basis, with each issue receiving separate analysis."  <u>Thabault v. Chait</u>,

541 F.3d 512, 535 (3d Cir. 2008) (citing <u>Warriner v. Stanton</u>, 475 F.3d 497, 500 (3d Cir. 2007);

<u>Erny v. Estate of Merola</u>, 171 N.J. 86, 94 (2002)).  Where the conflict of laws analysis results in

the application of the substantive law of another jurisdiction, New Jersey also "borrows" the

statute of limitations from that jurisdiction.  <u>Warriner</u>, 475 F.3d at 500 n.2 (citing <u>Heavner v.</u>

<u>Uniroyal, Inc.</u>, 63 N.J. 130, 141 (1973)).

        Until recently, the conflict of laws analysis applied in New Jersey to tort claims was the

"governmental interest" test.  <u>See</u> <u>Warriner</u>, 475 F.3d at 500; <u>Fu v. Fu</u>, 160 N.J. 108, 118 (1999).

 Under that test, a court would first determine if an actual conflict existed between the states

involved; if so, the court would next "identify the governmental policies underlying the law of

each state and how those policies are affected by each state's contacts to the litigation and to the

parties."  <u>Warriner</u>, 475 F.3d at 501 (citing <u>Veazey v. Doremus</u>, 103 N.J. 244, 247-48 (1986)).

        In <u>P.V. v. Camp Jaycee</u>, 197 N.J. 132 (2008), the Supreme Court of New Jersey adopted

a new framework for resolving conflict of laws disputes for tort claims.  In <u>Camp Jaycee</u>, the

parents of a mentally disabled resident of New Jersey filed suit on her behalf against a New

Jersey charity, alleging that she was sexually assaulted at the charity's summer camp in

Pennsylvania.  Id. at 136-37.  The complaint alleged that Camp Jaycee and its employees were

negligent and careless in the supervision of P.V. at the camp in Pennsylvania.  Id. at 137.  The

trial court granted the charity's motion for summary judgment based on New Jersey's charitable

immunity statute.  Id.  The Appellate Division found that Pennsylvania had a greater

governmental interest in regulating the conduct of entities operating within its borders than New

Jersey had in immunizing not-for-profit corporations, and thus applied Pennsylvania law, which

did not confer immunity on Camp Jaycee.  P.V. ex rel. T.V. v. Camp Jaycee, 393 N.J. Super. 19,

26-27 (App. Div. 2007).  The trial court and the Appellate Division each applied New Jersey's

flexible "governmental interests" test, but reached different results.  On November 24, 2008, the

New Jersey Supreme Court issued an opinion in which it affirmed the decision of the Appellate

Division to apply Pennsylvania law, but declined to apply the governmental interest test to the

tort claim; rather it applied the "most significant relationship" test of the Restatement (Second)

of Conflict of Laws (1971) (the "Restatement").  The Court reasoned that although it had

continued "to denominate our standard as a kind of governmental interest test, we now apply the

Second Restatement's most significant relationship standard in tort cases."  Camp Jaycee, 197

N.J. at 142-43 (citing Erny, 171 N.J. at 95-97 and Fu, 160 N.J. at 119-39).  Thus, the Court

adopted the most significant relationship test and the corresponding choice of law factors

included in the Restatement for analysis of conflict of laws for tort claims.  Id.

New Jersey's most significant relationship test has two steps.  The first step is to examine

the substance of the potentially applicable laws to determine whether an actual conflict exists.

Id. at 143 (citing Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)).  If there is no

distinction between the potentially applicable laws, there is no choice-of-law issue to be resolved

and the court will apply the law of the forum state.  Id.  If an actual conflict exists, the second

step of the most significant relationship test is to weigh the factors enumerated in the section of

the Restatement that corresponds to the cause of action.  For example, in Camp Jaycee, where

the plaintiff's claim was for personal injury, the relevant section of the Restatement was § 146,

which recognizes that the state in which a personal injury occurs is likely to have the

predominant relationship to the parties and issues in the litigation.  Id. at 144.  It is from the

vantage point of the relevant section of the Restatement that "we turn to the remaining contacts

set forth in sections 145 and the cornerstone principles of section 6" of the Restatement to

determine whether another state has a "more significant relationship . . . [with] the occurrence

and the parties" than the state dictated by the relevant section of the Restatement.  Id.

**C.     Mr. Zarkades's Claims for Fraud and Negligent Misrepresentation**

        Mr. Zarkades's claims in the SAC/TPC of fraud against Intarome and Mr. Funsch are

based on three allegations:  (1) that Mr. Funsch told him that the ESOP transaction had closed on

September 13, 2001 when, according to Mr. Zarkades, Mr. Funsch knew that the transaction

would not close until September 18, 2001; (2) that Mr. Funsch told Mr. Zarkades that if he sold

his shares to the ESOP, he could not longer be employed by Intarome, although Mr. Funsch

knew this statement to be untrue; and (3) that Mr. Funsch concealed and failed to disclose to Mr.

Zarkades all information material to the purchase of the Class A shares by the ESOP, including a

copy of the Stock Purchase Agreement.  Mr. Zarkades's claims of negligent misrepresentation

against Intarome and Mr. Funsch are based on the first two factors upon which he bases his

allegations of fraud.  Mr. Zarkades alleges that he relied upon these "material

misrepresentations" made knowingly by Mr. Funsch on behalf of Intarome, and was therefore unable to make an informed decision regarding whether to sell his Class A shares to the ESOP.

> ### i.  *Choice of Law*

The possible statutes of limitations to be applied to Mr. Zarkades's claims of fraud and negligent misrepresentation are Delaware, California, and New Jersey, and the parties do not dispute that an actual conflict of laws exists as to the statutes of limitations applied by these three states for a claim of fraud or negligent misrepresentation.  The statute of limitations for these claims under Delaware law is three years.  Krahmer v. Christie's Inc., 903 A.2d 773, 778 (Del. Ch. 2006); 10 Del. C. § 8106.  In California, the relevant statute of limitations for fraud is three years and for negligent misrepresentation is two years.  Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049, 1054 (9th Cir. 2008) (citing Cal. Civ. Proc. Code §§ 338(d), 339); but see Luksch v. Latham, 675 F. Supp. 1198, 1204 n.10 (N.D. Cal. 1987) (three year statute of limitations in section 338 should apply to negligent misrepresentation because it is a "creature of fraud and deceit").  Under New Jersey law, the statute of limitations for a claim of fraud or negligent misrepresentation is six years.  S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 425 (3d Cir. 1999); see N.J.S.A. 2A:14-1.  The parties do not dispute that Mr. Zarkades's claims of fraud and negligent misrepresentation accrued in the summer of 2001.

Because a conflict exists among the statutes of limitations for the three states, the point of departure for the second step of the conflict of laws analysis is the relevant section of the Restatement.  Section 148, on fraud and misrepresentation, states:

(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Section 148(1) explains that if the plaintiff's action in reliance on the defendant's false representations took place in the state where the false representations were made and received, then the local law of that state applies, unless another state has a more significant relationship under the principles of § 6. Section 148(2) also refers to the "plaintiff's action in reliance," but, here, Mr. Zarkades alleges that, in reliance on the false representations of Mr. Funsch, he took no action. As acknowledged in comment (c) to § 148, when loss is pecuniary in nature, the place of loss is often difficult to determine (as opposed to when damage consists of physical injury to persons or tangible things). The place of loss is even more difficult to determine when the plaintiff's reliance on a misrepresentation takes the form of non-action. Thus, in the choice of

13

law analysis for fraud and misrepresentation, the place of loss does not play as important a role as does the place of injury in the case of injury to persons or tangible goods.  Restatement (Second) of Conflict of Laws § 148 cmt. c (1971).  The place where the defendant made the false representation, however, is as important a contact in the choice of law analysis for fraud or misrepresentation as is the place of the defendant's conduct in the case of injury to persons or tangible goods.  Id.

Because Mr. Zarkades alleges that his reliance on Mr. Funsch's misrepresentation took the form of non-action, § 148(1) of the Restatement does not apply, and the court will review the factors of § 148(2):

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations – This factor does not apply because Mr. Zarkades claims to have taken no action in reliance upon Mr. Funsch's representations.

(b) the place where the plaintiff received the representations – Mr. Zarkades alleges that he received the representations, in person, from Mr. Funsch while at Intarome's Norwood, New Jersey corporate headquarters.  Mr. Zarkades alleges that, between July 1 and August 20, 2001, Mr. Funsch made two offers to him on behalf of Intarome's ESOP to purchase his stock.  Mr. Zarkades alleges that Mr. Funsch made these offers after two meetings the two men attended at Intarome's corporate headquarters in New Jersey.  Mr. Zarkades alleges that Mr. Funsch told him that he could no longer be an employee of Intarome if he sold his shares to the ESOP.  He also alleges that Mr. Funsch failed to fully disclose all information material to the potential sale of Mr. Zarkades's stock to the ESOP because Mr. Funsch did not provide him with the Stock Purchase Agreement, which contained the material details of the stock purchase.  Intarome and

14

Mr. Funsch deny that Mr. Funsch made any such misrepresentations or failed to disclose information, but admit, for the purposes of this motion that, Mr. Funsch's misrepresentations and non-disclosures, if they occurred, were made in New Jersey.  Mr. Zarkades also alleges that Mr. Funsch made a misrepresentation to him on September 14, 2001 regarding the closing date of the ESOP; the parties do not directly address where this misrepresentation was allegedly made and received, but it appears from the evidence submitted in connection with this motion and the parties' previous motions for summary judgment that it was made to Mr. Zarkades in California by Mr. Funsch in New Jersey.

(c) the place where the defendant made the representations – Mr. Zarkades alleges that Mr. Funsch made the representations in New Jersey.

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties – Mr. Zarkades's domicil and residence is California.  Intarome is incorporated in Delaware and has its principal place of business in New Jersey.

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time – This factor is not applicable, as there was no tangible thing that was the subject of a transaction between the parties.

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant – Mr. Zarkades does not claim to have been induced to enter into a contract based on false representation, so this factor is also not applicable.

Thus, of the six factors in § 148(2), only three apply:  (b) the place where the misrepresentation was received; (c) the place where the misrepresentation was made; and (d) the domicile, residence and place of business of the parties.  Regarding factors (b) and (c), the alleged representations were made and mostly received in New Jersey.  The place where the misrepresentations were made "occupies a position wholly analogous to . . . the place of conduct that results in injury to persons or tangible things," which, as described in §§ 146-147 of the Restatement, is usually the state with the greatest interest.  Additionally, the place where the misrepresentations were made and received are approximately of equal importance.  Restatement (Second) of Conflict of Laws § 148 cmt. g (1971).  With respect to factor (d), the contacts are split among California, Delaware, and New Jersey.  Of these contacts, California carries the most weight because "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant," because a person's financial loss will generally be of greatest concern to the state with which that person has the closest relationship.  Id. cmt. i.

Comment (j) to § 148 of the Restatement offers guidance on weighing these factors.  If any of the six factors above, other than the defendant's domicil, state of incorporation or place of business, "are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues."  Id. cmt. j.  Because the alleged misrepresentations were all made in New Jersey and most were received in New Jersey, under § 148 of the Restatement, the law of New Jersey will apply to Mr. Zarkades's claim of fraud unless, in light of the contacts in § 145 or the principles of § 6, another state has "a more significant relationship" to the parties and the claims at issue.  See Camp Jaycee, 197 N.J. at 144-45.

16

Under § 145(2) of the Restatement, the contacts to be taken into account in applying the principles of § 6 are:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  For claims of fraud and misrepresentation, the place where the injury occurred does not play an important role in the choice of the applicable law because there is "little reason in logic or persuasiveness to say that one state rather than another is the place of injury."  Restatement (Second) of Conflict of Laws § 145 cmt. e (1971).  When the place of injury cannot be ascertained, the place where the conduct occurred "will usually be given particular weight in determining the state of the applicable law."  Id.  As discussed above, the alleged misrepresentations in this matter were all made in New Jersey and most were received there.  Also as discussed above, the factor regarding domicil, residence, nationality, place of incorporation and place of business of the parties involves contacts with California (Mr. Zarkades's domicile), Delaware (Intarome's place of incorporation), and New Jersey (Intarome's place of business and Mr. Funsch's place of domicil).  The last factor under § 145(2) – the place where the relationship between the parties is centered – does not clearly implicate one state.  Mr. Zarkades lived in California and worked for Intarome there, but Intarome has its headquarters in New Jersey and Mr. Zarkades traveled to Intarome's office there at least occasionally.  In sum, under the factors of §§ 148(2) and 145(2) of the Restatement, the contacts with New Jersey are greater than those with California or Delaware because of the importance attributed to the fact that the alleged misrepresentations were all made in New Jersey and most were received in New Jersey.  There are, however, contacts with California to be considered, as Mr. Zarkades lived and

17

worked for Intarome there.  It is at this point that the analysis turns to § 6 of the Restatement to determine whether the considerations in that section "gin up or diminish the values to be ascribed to the contacts relative to the issues presented."  Camp Jaycee, 197 N.J. at 147.

"Reduced to their essence, the section 6 principles are:  (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states."  Id. (quoting Erny, 171 N.J. at 101-02 (internal quotations omitted)).  The interest of interstate comity seeks "to further harmonious relations between states and to facilitate commercial intercourse between them."  Restatement (Second) of Conflict of Laws § 6 cmt. d (1971).  "It considers 'whether application of a competing state's law would frustrate the policies of other interested states.'"  Camp Jaycee, 197 N.J. at 152 (quoting Fu, 160 N.J. at 122.  Here, as discussed below, California and New Jersey have similar policies regarding their statutes of limitations and general tort laws, so the application of New Jersey law would not frustrate the policy of California.  The second factor – the interests of the parties – is "a factor of extreme importance in the field of contracts," but generally "plays little or no part in a choice-of-law question in the field of torts."  Fu, 160 N.J. at 123.  The third and fifth factors – the interests underlying the field of tort law and the competing interests of the states – overlap.  The purposes behind California's and New Jersey's tort laws and statutes of limitations are similar.  "Both New Jersey's and California's policies in a tort context consist primarily of compensation and deterrence."  Dent v. Cunningham, 786 F.2d 173 (3d Cir. 1986).  The public policy underlying California's statutes of limitations is "to ensure 'prompt assertion of known claims.'"  McCoy v. Superior Court of Orange County, 157 Cal. App. 4th 225, 231 (2007) (quoting Beal Bank, SSB v. Arter & Hadden,

18

LLP, 42 Cal. 4th 503, 512 (2007)).  Similarly, the policies underlying New Jersey's statutes of

limitations are that of repose, Galligan v. Westfield Ctr. Serv., Inc., 82 N.J. 188, 191-92 (1980);

"to ensure the defendants' 'ability to answer the allegations against them;'" and "to spare the

courts from the burden of stale claims." Jaworowski v. Ciasulli, 490 F.3d 331, 334 (3d Cir.

2007) (quoting Galligan, 82 N.J. at 192).  Because the interests underlying the field of tort law in

California and New Jersey are not in conflict, and the interests of the two states are not in

conflict, factors three and five above do not serve to change the presumptive choice of law based

on the analysis under § 148(2).  Finally, the fourth factor – the interests of judicial administration

– requires the court to consider "issues such as practicality and ease of application." Camp

Jaycee, 197 N.J. at 154.  Here, the application of New Jersey law would be slightly easier than

the application of California law, as this court sits in New Jersey and is accustomed to applying

the State's law.

Because none of the aforementioned factors suffice to rebut the presumption, based on

the factors in § 148(2), that New Jersey has the most significant relationship with the parties and

the issues related to Mr. Zarkades's fraud and misrepresentation claims, the court will apply New

Jersey's six-year statute of limitations to these claims.

### ii. Relate Back Doctrine

New Jersey's statute of limitations mandates that actions for recovery for fraud or

negligent misrepresentation "shall be commenced within 6 years next after the cause of any such

action shall have accrued." N.J.S.A. 2A:14-1.  The parties do not dispute that these causes of

action accrued in July 2001, so Mr. Zarkades must have commenced his action for recovery on

these claims by July 2007.  Mr. Zarkades filed his First Amended Cross-Complaint on May 1,

19

2007, and filed his SAC/ TPC on February 26, 2008.  His First Amended Cross-Complaint did

not contain the claims for fraud and negligent misrepresentation; those claims were added in the

SAC/TPC.  Thus, the court must determine whether the fraud and negligent misrepresentation

claims "relate back" to the date of the First Amended Cross-Complaint and can be accorded a

filing date of May 1, 2007.

"Under the Erie doctrine, federal courts sitting in diversity apply state substantive law

and federal procedural law," Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996), so

the question of whether Mr. Zarkades's amended claims "relate back" to his original claims is

controlled by Federal Rule of Civil Procedure 15.  "Amendments made after the statute of

limitations has run relate back to the date of the original pleading if the original and amended

pleadings 'ar[i]se out of the conduct, transaction, or occurrence.'"  Mayle v. Felix, 545 U.S. 644,

655 (2005) (quoting Fed. R. Civ. P. 15(c)(2)).  Here, Mr. Zarkades's May 1, 2007 cross-

complaint also detailed the events surrounding the formation of the ESOP and the sale, by other

shareholders but not Mr. Zarkades, of Intarome stock to the ESOP, including Mr. Funsch's

statement to Mr. Zarkades that he could no longer be employed by Intarome if he sold his stock

to the ESOP.  Because Mr. Zarkades's claims of fraud and negligent misrepresentation arise out

of the same "conduct, transaction or occurrence" as alleged in his May 1, 2007 cross-complaint,

his claims of fraud and negligent misrepresentation "relate back" to that original filing and are

therefore not barred by the statute of limitations.

### iii.    Elements of Fraud

The five elements of common law fraud are: "(1) a material misrepresentation of the

presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resultant damages." <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 610 (1997). For the purpose of this motion only, Intarome and Mr. Funsch admit the first three elements required for proof of common law fraud. They dispute, however, both that Mr. Zarkades relied on the misrepresentations made by Mr. Funsch and that Mr. Zarkades can prove that these misrepresentations caused him any loss.

First, Intarome and Mr. Funsch argue that Mr. Zarkades cannot prove that he reasonably relied upon Mr. Funsch's misrepresentations regarding the ESOP because Mr. Zarkades has admitted that the only reason he did not sell his share was his reliance on Mr. Funsch's misrepresentation regarding his inability to remain employed by Intarome if he sold his shares. Mr. Zarkades's October 17, 2008 certification stated, "Had I been offered the opportunity by Intarome to sell my 12,200 Class A shares of stock without having to leave Intarome, I would have sold all of my stock in Intarome and received the same amount of money that Walter Zachritz received, which was $624,974." (Certification of Michael G. Zarkades in Support of Zarkades's Motion for Partial Summary Judgment ¶ 23, October 17, 2008.) However, even if this statement by Mr. Zarkades means that the <u>only</u> misstatement of Mr. Funsch's upon which he relied was the statement regarding his continued employment with Intarome, such reliance could satisfy the requirement of "reasonable reliance" as the fourth element of common law fraud.

Second, Intarome and Mr. Funsch argue that Mr. Zarkades cannot prove the "resultant damages" required as the fifth element of common law fraud. They argue that Mr. Zarkades did not have a legally enforceable right to sell his shares and, thus, cannot establish that Mr. Funsch's alleged misrepresentations and concealments caused him any damages. While

Intarome and Mr. Funsch are correct that terms of the Subscription Agreement did not require

Intarome to give Mr. Zarkades the opportunity to sell his shares to the ESOP, it does not follow

that Mr. Zarkades had no legally enforceable right to sell his shares.  As the rightful owner of

those shares, if someone offered to buy them, Mr. Zarkades was free to accept that offer.  If Mr.

Funsch did offer to purchase Mr. Zarkades's shares of Intarome, Mr. Zarkades had the right to

accept that offer.  If, in reliance on Mr. Funsch's misrepresentations, Mr. Zarkades did not accept

that offer and was damaged as a result, he may be able to satisfy the fifth element required to

prove common law fraud.

Because of these issues of material fact regarding proof of the elements of common law

fraud, summary judgment dismissing Mr. Zarkades's claims of fraud is not appropriate.

### iv. Elements of Negligent Misrepresentation

The elements of negligent misrepresentation are essentially the same as those of common

law fraud except negligent misrepresentation does not require scienter.  "Negligent

misrepresentation is . . . [a]n incorrect statement, negligently made and justifiably relied on,

[and] may be the basis for recovery of damages for economic loss . . . sustained as a consequence

of that reliance."  Kaufman v. i-Stat Corp., 165 N.J. 94, 109 (2000) (quoting H. Rosenblum, Inc.

v. Adler, 93 N.J. 324, 334 (1983), superseded by statute on other grounds, (internal quotations

omitted)).  For the same reasons that summary judgment on Mr. Zarkades's claims of fraud is

not appropriate, summary judgment dismissing his claims of negligent misrepresentation is not

appropriate.

**D.**    **Mr. Zarkades's Claim for Breach of Fiduciary Duty**

Mr. Zarkades's claims in the SAC/TPC for breach of fiduciary duty against Intarome and Mr. Funsch are based on three allegations: (1) that Mr. Funsch told him that the ESOP transaction had closed on September 13, 2001 when, according to Mr. Zarkades, Mr. Funsch knew that the transaction would not close until September 18, 2001; (2) that Mr. Funsch told Mr. Zarkades that if he sold his shares to the ESOP, he could not longer be employed by Intarome, although Mr. Funsch knew this statement to be untrue; and (3) that Mr. Funsch concealed and failed to disclose to Mr. Zarkades all information material to the purchase of the Class A shares by the ESOP, including a copy of the Stock Purchase Agreement.

The possible laws to be applied to any of Mr. Zarkades's claims at issue in this motion are Delaware (where Intarome is incorporated), California (where Mr. Zarkades is a resident and conducted some of his work for Intarome), and New Jersey (the principal place of business of Intarome). The parties do not dispute that an actual conflict of laws exists as to the statutes of limitations applied by these three states for a claim of breach of fiduciary duty. The statute of limitations for such a claim under Delaware law is three years. In re Fruehalf Trailer Corp., 250 B.R. 168, 184 (D. Del. 2000). In California, the statute of limitations is four years. Solomon v. N. Am. Life & Cas. Ins. Co., 151 F.3d 1132, 1137-38 (9th Cir. 1998) ("California courts have expressly held that claims for breach of fiduciary duty are governed by the four-year statute of limitations.") (citing Cal. Civ. Proc. Code § 343; Stalberg v. W. Title Ins. Co., 230 Cal. App. 3d 1223, 1230 (Cal. Ct. App. 1991)). Under New Jersey law, the statute of limitations for a claim of breach of fiduciary duty is six years. Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 226 n.13 (3d Cir. 2001); see N.J.S.A. 2A:14-1.

23

Intarome and Mr. Funsch argue that, under the internal affairs doctrine, Delaware law should be applied to Mr. Zarkades's claim of breach of fiduciary duty.  "Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs." Fagin v. Gilmartin, 432 F.3d 276, 282 (3d Cir. 2005).  "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."  Edgar v. MITE Corp., 457 U.S. 624, 645 (1981) (citing Restatement (Second) of Conflict of Laws § 302 cmt. b (1971)).  The Restatement explains the doctrine by offering examples of internal affairs "which involve primarily a corporation's relationship to its shareholders," including:

> [S]teps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares, . . . the issuance of bonds, the declaration and payment of dividends, loans by the corporation to directors, officers and shareholders, and the purchase and redemption by the corporation of outstanding shares of its own stock.

Restatement (Second) of Conflict of Laws § 302 cmt. a (1971).

Thus, the first question is whether Mr. Zarkades's claims of breach of fiduciary duty against Intarome and Mr. Funsch involve an "internal affair" of Intarome, which is incorporated in Delaware.  "Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant

24

stakeholders." In re Teleglobe Commc'ns Corp., 493 F.3d 345, 386 (3d Cir. 2007) (citing In re Topps Co. S'holders Litig., 924 A.2d 951, 960 (Del. Ch. 2007) (Strine, V.C.) (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs) and Restatement (Second) of Conflict of Laws § 306 (1971)).  Here, in his claims of breach of fiduciary duty, Mr. Zarkades alleges that "Funsch, as the President and as a Member of the Board of Directors of Intarome, owed an independent duty of care on behalf of Intarome to Zarkades, a shareholder," and that "Intarome owed an independent duty of care to Zarkades, a shareholder."  (SAC ¶¶ 49 – 51; TPC ¶¶ 3 – 5).  This allegation – of duties owed by Mr. Funsch and Intarome to Mr. Zarkades because he was a shareholder – is exactly sort of "internal affair" contemplated by the internal affairs doctrine.  This matter is, as the Supreme Court described, one "peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."  Edgar, 457 U.S. at 645.  Thus, under the internal affairs doctrine, the default law to be applied to Mr. Zarkades's claims of breach of fiduciary duty is Delaware.

The internal affairs doctrine, however, is not without exception.  As stated in § 302(2) of the Restatement, "The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied."  The factors of § 6 of the Restatement are used to evaluate the significance of a relationship, with respect to the particular issue, to the potentially interested states, here, Delaware and New Jersey.  Restatement (Second) of Conflict of Laws § 302 cmt. b (1971).

As discussed above regarding the conflict of laws analysis for Mr. Zarkades's fraud and negligent misrepresentation claims, "[r]educed to their essence, the section 6 principles are:  (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Camp Jaycee, 197 N.J. at 147 (quoting Erny, 171 N.J. at 101-02 (internal quotations omitted)).  The interest of interstate comity seeks "to further harmonious relations between states and to facilitate commercial intercourse between them."  Restatement (Second) of Conflict of Laws § 6 cmt. d.  "It considers 'whether application of a competing state's law would frustrate the policies of other interested states.'" Camp Jaycee, 197 N.J. at 152 (quoting Fu, 160 N.J. at 122).  Here, New Jersey and Delaware have similar policies regarding their statutes of limitations and general tort laws, so the application of Delaware law would not frustrate the policy of New Jersey.  In Delaware, "the purpose of an award of damages in a tort action is just and full compensation, with the focus on the plaintiff's injury and loss." DeAngelis v. Harrison, 628 A.2d 77, 81 (Del. 1993) (citing Jardel Co., Inc. v. Hughes, 523 A.2d 518 (Del. 1987)).  In New Jersey, as the Court of Appeals has consistently identified, the policies underlying tort consist "primarily of compensation and deterrence." Warriner, 475 F.3d at 501 (quoting Schum v. Bailey, 578 F.2d 493, 496 (3d Cir. 1978) (internal quotations omitted)).  The policies underlying New Jersey's statutes of limitations are that of repose, Galligan, 82 N.J. at 191-92; "to ensure the defendants' 'ability to answer the allegations against them;'" and "to spare the courts from the burden of stale claims." Jaworowski, 490 F.3d at 334 (quoting Galligan, 82 N.J. at 192).  Similarly, in Delaware, the "public policy underlying statutes of limitation in general [is] to compel timely pursuit of claims and to avoid the adjudication of stale claims." State ex

rel. Brady v. Pettinaro Enters., 870 A.2d 513, 532 (Del. Ch. 2005). The second factor – the

interests of the parties – is "a factor of extreme importance in the field of contracts," but

generally "plays little or no part in a choice-of-law question in the field of torts." Fu, 160 N.J. at

123. The third and fifth factors – the interests underlying the field of tort law and the competing

interests of the states – overlap. As discussed above, the purposes behind Delaware's and New

Jersey's tort laws and statutes of limitations are similar, so factors three and five do not serve to

change the presumptive choice of law under the internal affairs doctrine. Finally, the fourth

factor – the interests of judicial administration – requires the court to consider "issues such as

practicality and ease of application." Camp Jaycee, 197 N.J. at 154. Here, the application of

New Jersey law would be slightly easier than the application of Delaware law, but this factor, on

its own, is not sufficient to outweigh the internal affairs doctrine. Thus, Mr. Zarkades's claims

against Intarome and Mr. Funsch for breach of fiduciary duty are governed by the law of the

state of Intarome's incorporation – Delaware law.[2]

The statute of limitations for a claim of breach of fiduciary duty under Delaware law is

three years. Mr. Zarkades claims that Mr. Funsch and Intarome breached a fiduciary duty to him

in 2001, but Mr. Zarkades did not file his first cross claims in this case until May 2007, so his

claims for breach of fiduciary duty are time-barred and will be dismissed.

---

[2] Mr. Zarkades argues that § 309 of the Restatement applies to this situation, but comment (a) of § 309 makes clear that the section should be applied to determine the law governing the liability of a director or officer to "the corporation and its creditors and shareholders as a class. The rule does not apply to individual transactions between a director and a creditor or shareholder." (emphasis added.)

## III.  CONCLUSION

For the reasons set forth above, Intarome and Mr. Funsch's motion for summary judgment will be granted on Count Three of the Second Amended Counterclaim and on Count One of the Third Party Complaint, and will be denied on Counts Four and Five of the Second Amended Counterclaim and on Counts Two and Three of the Third Party Complaint.  The Court will enter an order implementing this opinion.

                     s/ Dickinson R. Debevoise

DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  March 27, 2009